IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BARBARA HAMILTON,           )
                            )
           Plaintiff,       )
                            )
     v.                     )     No. 08-3277-CV-S-MJW
                            )
MISSOURI DEPARTMENT OF      )
CORRECTIONS, et al.,        )
                            )
           Defendants.      )

# ORDER

Plaintiff Barbara Hamilton alleges defendants discriminated against her based on her sex; that she was subjected to a hostile work environment; and that defendants retaliated against her because of a prior lawsuit. Plaintiff seeks relief under Title VII, the Missouri Human Rights Act (MHRA), and Missouri state laws which provide relief for intentional or negligent infliction of emotional distress. Defendants filed a motion for summary judgment, which has been fully briefed and submitted.

## I. Legal Standard Governing Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure requires "the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden on the party moving for summary judgment "is only to demonstrate . . . that the record does not disclose a genuine dispute on a material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Co-Op., 838 F.2d 268, 273 (8th Cir. 1988).

Once the moving party has done so, the burden shifts to the nonmoving party to go beyond his pleadings and show, by affidavit or by "depositions, answers to interrogatories, and admissions on file," that there is a genuine issue of fact to be resolved at trial. Celotex, 477 U.S. at 323. Evidence of a disputed factual issue which is merely colorable or not significantly

probative, however, will not prevent entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment, however, "is an extreme remedy, to be granted only if no genuine issue exists as to any material fact." Hass v. Weiner, 765 F.2d 123, 124 (8th Cir. 1985). In ruling on a motion for summary judgment, this court must view all facts in a light most favorable to the nonmoving party, and that party must receive the benefit of all reasonable inferences drawn from the facts. Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989).

If "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," the court must grant summary judgment. Fed. R. Civ. P. 56.

## II. Discussion

A. Mailroom Camera

Plaintiff Barbara Hamilton is a female Corrections Officer I who has worked for the Missouri Department of Corrections since 1998. From July 2001 to present, plaintiff was assigned to work at Ozark Correctional Center (OCC). Beginning in 2005, plaintiff was assigned as the Control Officer on third shift, 3:00 p.m. to 12:00 p.m. Following an injury to her hand in December 2006, plaintiff was placed on light duty and assigned to the mailroom at OCC, starting in June 2007. The mailroom was the standard assignment for those assigned to or placed on light duty. Despite the mailroom staff's regular work schedule of 7:00 a.m. to 5:30 p.m., plaintiff was allowed to keep her regular 3:00 p.m. to 12:00 p.m. shift, Monday through Friday. Working this modified schedule resulted in plaintiff working alone in the mailroom after 5:30 pm. The mailroom is located in a building outside the prison's security perimeter fence. In addition to the mailroom, the building also contained other staff offices, a weight room, a kitchen, one bathroom, storage rooms, and a sleepover room. The building remained open 24 hours a day to allow its use by OCC employees from all the differing shifts.

After plaintiff was assigned to the mailroom, reports were received suggesting that inappropriate conduct was possibly occurring in the mailroom while plaintiff was working. These reports came from several prison employees. The mailroom supervisor at the time, defendant Deputy Warden Brian O'Connell, received reports from two of the mailroom female employees, Clouse and McAnally. Clouse and McAnally reported there were a lot more visitors

2

to the mailroom than before, and many of the visitors were custody supervisors who would visit plaintiff and stay for twenty minutes. They also reported that plaintiff received many telephone calls while working in the mailroom. They further reported that the nature of the telephone calls and visits were personal. Clouse and McAnally reported they believed that Hamilton and her visitors' behavior was inappropriate for the workplace, and it made them uncomfortable. McAnally and Clouse reported that on several occasions when they arrived at the mailroom in the mornings, they noticed evidence that groups had been in the mailroom since they had left the previous night, including pizza boxes and candy wrappers, and also noticed the odor of cigarette smoke, although the building was nonsmoking.

During this same time, defendant Major Burkdoll, Chief of Custody at OCC, who is responsible for the safety and security of OCC, received reports that two OCC captains, Cargill and Terry, were leaving their posts to visit with Hamilton for long periods, which was a breach of security. Additionally, the reports from the corrections officers stated that the captains were using a side gate to leave the security perimeter of the prison, bypassing normal checkout procedures. This meant there were no records of the captains leaving the security perimeter. A report was also received from the Warden's secretary, Teresa Lewis, stating she had seen plaintiff with Captain Terry at a casino in Oklahoma. Because of all of these reports, defendants state they had concerns with the security risks being posed by the captains' actions, as well as concerns the captains were violating the department's fraternization policy by becoming romantically involved with plaintiff. Defendants O'Connell and Burkdoll determined these reports warranted further investigation.

Defendants O'Connell and Burkdoll asked OCC Electronics Technician, defendant Rohn Carter, and his supervisor, nondefendant Larry Trapp, whether it was feasible to place a camera near the mailroom to determine if the captains were leaving their posts to socialize with plaintiff. Upon confirmation by Carter and Trapp that the camera was feasible, approval for the placement of the camera was sought from defendant Warden Lansdown. Warden Lansdown approved the camera and its placement in the mailroom building. In mid-July 2007, a motion-activated camera was placed in a hole in defendant Carter's office door, hidden in the top hole of the "B" in a leftover paper Halloween decoration that said "BOO." The camera was aimed at the hallway

in the front of the mailroom door.  Within the camera frame was the door to the building's bathroom.  Defendant Carter states it did not occur to him that people using the bathroom would not close the door to the bathroom, given the building was owned by the State as part of the prison, and open twenty-four hours a day, seven days a week.  When plaintiff or other employees left the door open to the bathroom, the toilet could not be seen, but it could be inferred from what was viewable that the persons were using the toilet.  The camera filmed for two to three weeks until it was removed on August 1 or 2, 2007.  The last recording occurred on July 30, 2007.

Officer Hamilton discovered the camera on July 31, 2007, after hearing some noises coming from Carter's office, and noticing a hole in Carter's door with what appeared to have a camera attached.  Plaintiff subsequently filed a grievance on the placement of the camera.

The recordings from the camera provided no evidence to support the reports regarding security breaches or violation of the fraternization policy.  Plaintiff states the information used by defendants to initially support placing a camera in the mailroom area was nothing more than gossip, and was false.  Plaintiff states no one ever inquired of her regarding the suspected fraternization by supervisors, and she believes the purpose of the camera was to establish that she, rather than the male supervisors, was violating policy.  Plaintiff also states she believes the camera was placed with a clear intent to obtain recordings of individuals using the bathroom.  Plaintiff states the lock on the bathroom door was known to have problems and, therefore, she and others frequently did not close the door to the bathroom when it was believed no one was around.  The video recordings of the camera show plaintiff not closing the bathroom door on some occasions, and closing it on others.  The recordings also showed the same for other employees; sometimes the bathroom door was closed and others times it was not.  When the bathroom door is left open, the toilet cannot be seen in any of the recordings, but recordings can be seen of men flexing their muscles in the bathroom mirror, men standing in such a position that it appears they are probably urinating, plaintiff primping in the mirror, and one incident where plaintiff's buttocks are exposed.

B. Urinalysis Testing

In January 2007, prior to the camera incident, plaintiff was required to submit to a random urinalysis testing. Random urinalysis testing is common for prison employees and plaintiff had submitted to one before. Plaintiff claims, however, on this occasion, she was required to submit to such testing in the same area of a building where Sgt. Weeks, a defendant from her prior lawsuit against the prison[1], was present. Plaintiff claims Sgt. Weeks' presence constituted a hostile work environment and that his actions were done in retaliation against her for her previously filing a lawsuit. Plaintiff claims Sgt. Weeks was not only present in the area, but stared her down.

Plaintiff's random urinalysis processing was conducted, pursuant to prison policy, by Sgt. Tammy Drake, a urinalysis officer. Urinalysis testing is conducted in the Investigations Building. Within the Investigations Building, in the same large front room area, separated by a partition, was the duty station of Sgt. Weeks and the area where urinalysis paperwork is completed. When plaintiff arrived at the building, Sgt. Weeks was working at his desk. It was not required that Sgt. Weeks leave his office when employees were being processed to provide a urinalysis. Plaintiff did not request to fill out her paperwork in another room or area.

After filling out her paperwork, plaintiff was not physically able to provide the urine sample. Employees are given water and up to three hours to provide a urine sample. Plaintiff took the full three hours. While waiting, plaintiff sat in the large front room area of the Investigations Building. Sgt. Weeks came into the same area of the building to have a conversation with Theresa Lewis, the Policy and Procedures Coordinator, whose office/work area was in the front room area of the building. When plaintiff was finally able to provide the urine sample, it was done privately in a bathroom in the Investigations Building with the door closed. At no time did plaintiff request to anyone that Sgt. Weeks be asked to leave.

C. Firearms Training

Plaintiff claims that defendant O'Connell retaliated against her when he required her to attend firearms training while she was assigned on light duty. Defendant O'Connell concedes

---

[1] Hamilton v. Missouri Dep't of Corr., No. 06-3221 (W.D. Mo. 2006).

that persons on light duty should not be required to attend firearms training and that plaintiff being scheduled to attend such training while on light duty was a mistake.

D.  Plaintiff's Return to Full-duty Assignment

After sufficiently recovering from her hand injury, plaintiff was removed from her light-duty assignment in the OCC mailroom and was returned to her regular full-duty assignment at the OCC Control Center, working the same third shift to which she had been permanently assigned for three years.

### III.  Title VII Claims

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff claiming a Title VII discrimination claim has the burden of proving a prima facie case by a preponderance of the evidence.  Plaintiff claims she was discriminated against because of her sex, subjected to a hostile work environment based on her sex, and retaliated against because of a previous sex discrimination lawsuit she filed, in violation of Title VII.

A.  Title VII Individual and Official Capacity Liability

Title VII does not permit an action against an individual supervisor because liability is borne solely by employers.  Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1147 (8th Cir. 2008).  See also Spencer v. Ripley County State Bank, 123 F.3d 690, 691-92 (8th Cir. 1997). This means that for an individual to be held liable, he or she must be an employer.  Thus, here, plaintiff's claims fail against all defendants in their individual capacities.  Only plaintiff's claims against defendants in their official capacities, which are, in essence, claims against the State itself, are actionable under Title VII.

B.  Title VII Sex Discrimination

To establish a prima facie case of sex discrimination under Title VII, an employee must show:  (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated differently.  Higgins v.

Gonzales, 481 F.3d 578, 584 (8th Cir. 2007). Here, plaintiff, a female employee, is a member of a protected class, and there is no evidence to suggest she was not meeting her employer's expectations. Thus, plaintiff meets the first two prongs for establishing a prima facie case.

At step three, however, plaintiff has not come forward with evidence of an adverse employment action. "[An] adverse employment action must be one that produces a material employment disadvantage." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999). "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge." Id. "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong." Higgins, 481 F.3d at 584.

Prior to plaintiff being injured in December 2006, she had been assigned to the Control Center for three years, on what plaintiff termed a permanent basis. Subsequent to the actions about which plaintiff complains, and following her recuperation from her injury, plaintiff was returned to her previous permanent Control Center position, working the same shift and schedule. Plaintiff did not receive a cut in pay or benefits, nor was she transferred, demoted, or suspended, and she states she has not applied for any other positions at OCC since the claims relevant to this case occurred. Plaintiff's assertions with regard to an adverse employment action she suffered prior to the alleged actions in this case are not material to her Title VII sex discrimination claims in this case. Further, plaintiff's asserted prior adverse employment action, in the form of a denial of a transfer to a different job position within the OCC, was part of a previous lawsuit, which settled in plaintiff's favor and for which plaintiff released her claims. Plaintiff is barred from again asserting such claims in the instant case.

Thus, here, there is no dispute of material fact. Plaintiff has failed to come forward with evidence of an adverse employment action. Without an adverse employment action, plaintiff has not made a prima facie case under the McDonnell Douglas[2] burden-shifting framework, and

---

[2]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

defendants are entitled to judgment as a matter of law on plaintiff's Title VII sex discrimination claims.

C.  Title VII Hostile Work Environment Claims

Plaintiff alleges that the hidden surveillance video camera in the mailroom area, and the presence of Sgt. Weeks during her urinalysis testing constituted a hostile work environment. To establish a hostile work environment prima facie claim, a plaintiff must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. Nitsche v. CEO of Osage Valley Elec. Co-op., 446 F.3d 841, 845 (8th Cir. 2006).

Plaintiff is a female employee, and therefore, belongs to a protected group. As to the second and third elements, there is a question of fact as to whether Sgt. Weeks' presence during plaintiff's urinalysis testing and the actions of defendants who placed the hidden camera in the mailroom area, would qualify as unwelcome harassment based on plaintiff's sex. Nonetheless, even assuming that the second and third elements of a hostile work claim have been met, plaintiff has failed to come forward with evidence which could support the fourth element.

The fourth element, actionable harm, is a high threshold. Sutherland v. Missouri Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009). Plaintiff must show that the harassment is so severe or pervasive that it alters the employment conditions. Id. "Offensive conduct is insufficient to support a claim if it does not result in the requisite effect on the terms and conditions of employment." Id. at 752. As set forth above, there is no dispute of material fact that plaintiff has not suffered any kind of adverse employment action affecting the terms or conditions of her employment at OCC. Without evidence to support the fourth element of a prima facie case, defendants are entitled to judgment as a matter of law on plaintiff's claim of a hostile work environment.

D.  Title VII Retaliation Claims

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified,

8

assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e3(a). As with a Title VII discrimination claim, a retaliation claim requires the plaintiff to establish a prima facie case. If there is direct evidence of retaliation, or once plaintiff has made a prima facie case of retaliation, the burden-shifting analysis of McDonnell Douglas applies. To establish a prima facie retaliation claim, plaintiff must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. Sutherland v. Missouri Dep't of Corr., 580 F.3d 748, 752 (8th Cir. 2009).

Here, there is no direct evidence defendants' actions were in retaliation for a previously filed lawsuit. Therefore, plaintiff must establish a prima facie case for retaliation. As to element one, it is undisputed that plaintiff engaged in protected conduct when she previously filed a lawsuit alleging sex discrimination when she was denied a transfer to a different position within OCC. See Hamilton v. Missouri Dep't of Corr., No. 06-3221 (W.D. Mo. 2006). As to the second element, defendants dispute plaintiff's assertion that the placement of the camera in the mailroom building, Sgt. Weeks presence during her urinalysis testing, and Deputy Warden O'Connell's requiring plaintiff to attend firearms training while on light duty were materially adverse. Materially adverse means that the actions of defendants were such that they might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Co., 548 U.S. 53, 68 (2006).

The evidence shows that a security camera had not been placed in the mailroom prior to plaintiff's temporary light duty assignment to the mailroom. Further, no prisoner security concerns within the mailroom building supported the placement of the camera because the building was outside the security perimeter of the prison. The camera was hidden from view, and placed in a location in the building where it recorded not only the mailroom, but also the bathroom area. There is some evidence that defendants knew or should have known that the door to the bathroom was being left open at times by plaintiff and other employees using it, and therefore, the camera would record plaintiff and other employees in the bathroom. Recordings of plaintiff in the bathroom area were made. Based on this evidence, a reasonable juror could find

9

that defendants' actions of placing the camera in the mailroom would be materially adverse to a reasonable worker.

Further, in taking the evidence in the light most favorable to plaintiff, a reasonable jury could also conclude the actions of Sgt. Weeks, a defendant in plaintiff's previous lawsuit, in remaining for an extended period in the area where plaintiff was required to fill out paperwork and provide a urinalysis, while also staring plaintiff down, to be materially adverse.

Defendant Deputy Warden O'Connell's actions could also be determined to be materially adverse when taken in the light most favorable to plaintiff. A reasonable jury could find defendant O'Connell's actions of requiring plaintiff to attend firearms training despite her having a work-related hand injury and being assigned to light duty would be materially adverse to the reasonable worker.

As to element three, defendants dispute that their placement of the camera, Sgt. Weeks' actions surrounding plaintiff submitting a urinalysis, and Deputy Warden O'Connell's actions with regard to plaintiff's required attendance at firearms training, were related to plaintiff's previous lawsuit. Upon consideration of the facts as set forth above, this court concludes the nature of defendants' actions, in conjunction with the close time proximity between resolution of plaintiff's prior lawsuit in November 2006, and the claims in this case which arose in early and mid-2007, could support a reasonable jury's inference that plaintiff's previous lawsuit against OCC was a motivating factor in defendants' decisions and actions.

Further, with regard to the time proximity of defendants' placement of the camera in the mailroom building, the evidence shows the camera was placed in the mailroom building shortly after plaintiff's assignment to the building, and despite a lack of security concerns in the building, which was located outside the security perimeter of the prison. Moreover, the nature of the placement of the hidden camera in an area allowing recordings of plaintiff in the bathroom further supports an inference that defendants' actions were done because of plaintiff's prior filing of a lawsuit against OCC.

A jury could reasonably conclude that plaintiff's prior protected conduct of filing a lawsuit against OCC was a motivating factor in defendants' decisions and actions as set forth above. The court notes that the threshold of proof necessary to make a prima facie case is

minimal.  Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1109-10 (8th Cir. 1998).  Plaintiff has come forward with adequate evidence to support a prima facie case of retaliation.

Once a prima facie case is made, the McDonnell Douglas burden shifts to the defendants to provide legitimate nonretaliatory reasons for their actions.  With regard to placement of the camera, defendants Lansdown, O'Connell and Burkdoll state they requested defendant Carter to place a camera in the mailroom building because of security and policy violation concerns, not because of any retaliatory animus.  Defendants state that based on reports received from several OCC employees, they had reason to believe male prison supervisors were inappropriately leaving their assigned posts and the security perimeter of the prison in order to make personal visits with plaintiff in the mailroom.  Defendants further state reports were received suggesting that OCC supervisors, identified as Captains Cargill and Terry, may have been violating the fraternization policy of OCC with plaintiff.  As to the placement of the camera and recording of the bathroom area of the mailroom building, defendant Carter asserts that the location chosen for placement of the camera, concealed in his office door across the hall from the building's only bathroom, did not contemplate that plaintiff would leave the bathroom door open while in use.  Carter asserts that camera placement was based simply on the limited placement alternatives within the mailroom building.  Carter claims the technical requirements for the wireless camera limited its placement.  Carter states the wireless system was not very powerful and its signal did not have a long range, so the camera could not be placed very far from the DVR in his office, which was across the hall from the bathroom.

With regard to defendant Sgt. Weeks' actions in remaining in the area where plaintiff was required to fill out paperwork and submit a urinalysis, Sgt. Weeks asserts his office was in the same area of the building as the location for urinalysis testing, and moreover, at the time in question, he was having a conversation with Theresa Lewis, an OCC employee whose office was also located in that area of the building.  Sgt. Weeks asserts he was not in the area of the building because of plaintiff.

Deputy Warden O'Connell's concedes that plaintiff should not have been required to attend firearms training while on light duty.  However, O'Connell disputes there was any retaliatory motive, and asserts that plaintiff being required to attend was simply a mistake.

11

Pursuant to the McDonnell Douglas framework, these asserted nondiscriminatory reasons for placement of the camera in the mailroom building, Sgt. Week's presence in the area where plaintiff was required to submit to a urinalysis, and plaintiff being required by O'Connell to attend firearms training while on light duty, shifts the burden back to plaintiff to produce evidence that the proffered reasons are merely a pretext for retaliation.

In response to defendants' assertions of nonretaliatory reasons for a camera being placed in the mailroom area, plaintiff asserts that if security concerns regarding the Captains improperly leaving the security perimeter of the prison, specifically the side door where their absence would not be logged, were, in fact, the true concerns of the defendants, then defendants would have placed a camera at the prison side door, not at plaintiff's working area in the mailroom building. Plaintiff further claims that if defendants had no concern regarding her violating the fraternization policy, as defendants assert, they would have questioned her directly regarding the actions and behavior of Captains Terry and Cargill, rather than installing a hidden camera in her work area, without her knowledge. Plaintiff further claims the hidden camera's recording of her use of the bathroom area supports her claim that the purpose of the camera was not for the legitimate purposes asserted by defendants.

In response to the assertions of defendants Sgt. Weeks and Deputy Warden O'Connell of nonretaliatory reasons for their actions, plaintiff claims the circumstantial evidence, including the timing between plaintiff's prior protected conduct of filing a lawsuit against OCC in 2006, and the adverse actions of defendants, is sufficient to support her claim of retaliation.

In considering the totality of the evidence, in context, and giving plaintiff the benefit of all reasonable inferences, this court finds that plaintiff has adequately rebutted the nonretaliatory basis claimed by defendants. A reasonable juror could conclude defendants' motivation in placing the camera in the mailroom, Sgt. Weeks' actions surrounding plaintiff's urinalysis testing, and Deputy Warden O'Connell's actions requiring plaintiff to attend firearms training while injured and on light duty were retaliatory in nature. Specifically as to placement of the camera, an inference could be made by a reasonable jury that the camera was placed in the mailroom in an attempt to catch plaintiff in the act of violating prison policy, or otherwise obtain evidence against her in retaliation for her previously filing a lawsuit against OCC. Disputes of

12

material fact remain as to what were the actions of defendants, and the motivation behind them. These are jury questions. Genuine issues remain for trial on plaintiff's claim of retaliation under Title VII.

## IV.  Missouri Human Rights Act (MHRA) Claims

Title VII and the MHRA claims are governed by essentially the same standards. Hervey v. County of Koochiching, 527 F.3d 711, 719 (8th Cir 2008). Under the MHRA, it is "an unlawful employment practice for an employer, because of race, color, religion, national origin, sex, ancestry, age or disability of any individual to . . . discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment. . . ." Mo. Rev. Stat. § 213.055.1(1)(a)(b) (2004). Discrimination is defined under the MHRA in relevant part as "any unfair treatment based on based on . . . sex . . . as it relates to employment, disability or familial status." Mo. Rev. Stat. § 213.010(5).

As set forth above in the discussion of plaintiff's Title VII claims, she has failed to come forward with evidence that she suffered an adverse employment action. Evidence of an adverse employment action is required for a claim under the MHRA. Buchheit, Inc. v. Missouri Com'n on Human Rights, 215 S.W.3d 268, 277 (Mo. App. W.D. 2007). Plaintiff has failed to come forward with evidence from which a reasonable jury could conclude that her rights have been violated under the MHRA.

## V.  State Tort Claims

Plaintiff claims intentional infliction of emotional distress or, alternatively, negligent infliction of emotional distress. Defendants argue they are immune from such state tort claim and that plaintiff's allegation fails to state an actionable claim for intentional or negligent infliction of emotional distress.

To state a claim for intentional infliction of emotional distress, a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly causes severe emotional distress that results in bodily harm. Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. 1997). The conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Warrem v. Parrish, 436 S.W.2d 670, 673 (Mo.1969)).

The conduct must be "intended only to cause extreme emotional distress to the victim." <u>Gibson</u>, 952 S.W.2d at 249 (quoting <u>K.G. v. R.T.R.</u>, 918 S.W.2d 795, 799 (Mo. 1996)).

Plaintiff has come forward with no evidence from which a reasonable jury could support a claim for intentional infliction of emotional distress. There is no evidence that defendants' actions were so extreme and outrageous or that defendants' actions in any way caused or were intended to cause severe emotional distress to plaintiff.

To prevail under negligent infliction of emotional distress, a plaintiff must show: (1) the defendant should have realized his conduct involved an unreasonable risk of causing the distress, and (2) the emotional distress or mental injury must be medically diagnosable and sufficiently severe to be medically significant. <u>Gibson</u>, 952 S.W.2d at 248-49.

Plaintiff has also failed to come forward with evidence to support the requirements of a claim for negligent infliction of emotional distress. There is no evidence to support that defendants should have realized their conduct involved an unreasonable risk of causing distress. Moreover, plaintiff has failed to come forward with any evidence that she has suffered from a medically diagnosable emotional distress or mental injury. No reasonable jury could find for plaintiff on her claim for negligent infliction of emotional distress.

Because plaintiff fails to come forward with evidence to support her state law claims for infliction of emotional distress, the court need not address whether defendants are entitled to immunity on these claims.

### VI. Conclusion

For the reasons set forth in this order, and those set forth in defendants' suggestions in support of summary judgment,

IT IS ORDERED that defendants' motion for summary judgment is granted on all claims, except plaintiff's Title VII retaliation claims against defendants in their official capacities, on which summary judgment is denied. [51]

Dated this 23rd day of June, 2010, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*

MATT J. WHITWORTH
United States Magistrate Judge